71 Cal.2d 1170 (1969)
459 P.2d 259
81 Cal. Rptr. 5
THE PEOPLE, Plaintiff and Respondent,
v.
ERNEST WASHINGTON, Defendant and Appellant.
Docket No. Crim. 12403.
Supreme Court of California. In Bank.
October 3, 1969.
*1172 James Martin MacInnis, under appointment by the Supreme Court, for Defendant and Appellant.
Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Thomas Kallay, Deputy Attorney General, for Plaintiff and Respondent.
TRAYNOR, C.J.
By indictment Mrs. Leiala Spencer, Kenneth Davis, and defendant Ernest Washington, were jointly charged with the robbery and murder of Benjamin Kay. The trial court granted defendant's motion for a severance, and thereafter a jury found him guilty of first degree murder (Pen. Code, § 187) and first degree robbery (Pen. Code, § 211) and fixed the penalty for the murder at death. The trial court denied motions for a new trial and to reduce the penalty and entered judgment on the verdict. It stayed execution of sentence for both crimes pending this automatic appeal. (Pen. Code, § 1239, subd. (b).)
Mr. Kay owned a department store in San Diego. He made many credit sales to welfare recipients and other people who had low incomes. He personally collected from his credit customers by calling on them at their homes at the beginning and middle of each month when welfare recipients receive their checks. He carried as much as $1,000 in cash so that he could cash his customers' checks on such visits. On November 1, 1967, he was fatally beaten and robbed just after he had called at the home of Mrs. Spencer to make a collection.
The crime took place about 9 p.m. behind Mrs. Spencer's house. The area was very dark, for someone had tampered with the lights at the back of the house next door that otherwise would have illuminated the area. A witness saw Mr. Kay walk toward the back of Mrs. Spencer's house and heard him knock at the back door. Shortly thereafter he was found still alive but badly beaten. He died in a hospital the next morning.
A web of evidence implicated defendant in the crime. About ten days before it occurred, when defendant was visiting a witness at her house in the neighborhood, he looked out a window and said: "That's Ben Kay. He carries about five or six hundred dollars around with him every day ... and all you have to do is knock him in the head." He also mentioned that Kay came around on the first and sixteenth of every month.
*1173 On the afternoon of the day of the crime, Mr. Kay's son saw Mrs. Spencer and defendant together across the street from the Kay store gesturing in its direction. Defendant was then living at Mrs. Spencer's house, and he made a long distance telephone call from there about 7:05 p.m. on November 1.
Before November 1, defendant was unemployed and ineligible for relief. His car had been repossessed and he had unsuccessfully sought to borrow money from a friend. Between 7:30 and 8 on the evening of November 1, however, he telephoned another friend, Elvernon White, asked if he could use White's car, and said that he might have some money with which to get his own car back. At 8:30 the next morning he went to the dealer who had repossessed his car, paid him $100 and retrieved his car. Witnesses who saw him on the following days testified that he had many $20 bills and spent money freely. About 9 on the evening of the murder he checked into a motel some six minutes walking distance from Mrs. Spencer's house. He stayed for three days and paid the motel rent in cash.
Between 9:45 and 11 on the morning of November 2, defendant, Mrs. Spencer, and Davis were in the apartment of the witness Rodney Pitts. Pitts testified that the three spent some time in his kitchen whispering, that Mrs. Spencer had quite a few bills and many money orders that she had apparently purchased, and that she gave some of the money and money orders to Davis. When defendant left Pitts' apartment about 11 a.m., he met his friend Elvernon White on the street and told him, "I'm hot. I think I have killed a man," or "I have killed a man."
Defendant was arrested on November 4 as he was preparing to leave San Diego. He made several statements to police officers in which he gave differing accounts of the crime and the parts he, Davis, and Mrs. Spencer played in it. He was repeatedly warned of his constitutional rights, and he does not contend that any of his statements were inadmissible. Although defendant never admitted to the officers that he attacked Mr. Kay, he told them that he was present when Mrs. Spencer planned to have Davis rob Mr. Kay after Mr. Kay left her house; he admitted that he and Davis went behind Mrs. Spencer's house when Mr. Kay approached and stated that Davis hit him with a pipe, and that when Mr. Kay yelled, Davis hit him twice more. Defendant claimed that he got scared, walked away, and shortly thereafter checked into a *1174 motel. In a later statement defendant revised his account of the crime and stated that Mrs. Spencer "hit the old man; that she followed him out of the house and hit him with the pipe from the rear, from the back." He further stated that Mrs. Spencer had removed the light fixture from the back of the house next door.
The prosecution also introduced evidence that while defendant was in jail awaiting trial, he wrote two letters requesting friends to testify that he was at their houses from 5 to 8:30 on the evening of November 1.
Defendant testified in his own defense. He denied any involvement in the robbery and murder and stated that from 7:30 until 10 on the evening of November 1, he was in downtown San Diego looking for his wife. He denied having made many of the admissions attributed to him and testified that other admissions that he made were false.
[1] Defendant contends that the trial court erred in instructing the jury that he could be held liable for the acts of other persons if those acts were committed in furtherance of a conspiracy of which he was a member. He contends that there was no evidence of a conspiracy and points out that no conspiracy was charged against him in the indictment. There was substantial evidence, however, that defendant, Mrs. Spencer, and Davis entered into an agreement to rob Mr. Kay, that the agreement contemplated the use of violence against Mr. Kay, and that the robbery and murder were committed pursuant to and in furtherance of the agreement. [2] When there is evidence of a conspiracy to commit the substantive offenses charged, it is not error to instruct the jury on the law of conspiracy even though no conspiracy is charged. (People v. Teale (1965) 63 Cal.2d 178, 188 [45 Cal. Rptr. 729, 404 P.2d 209], reversed on other grounds, sub nom. Chapman v. California (1967) 386 U.S. 18 [17 L.Ed.2d 705, 875 Ct. 824]; People v. Durham (1969) 70 Cal.2d 171, 180 [74 Cal. Rptr. 262, 449 P.2d 198].)
After correctly stating the law of conspiracy applicable to the case, however, the court further instructed on the requirements of pleading and proving a conspiracy when a conspiracy is charged.[1] Realizing that such an instruction is inapposite when a conspiracy is not charged, the trial court extemporized an explanation of the distinction between a case *1175 in which conspiracy is charged and one in which a conspiracy theory is used to establish liability for the substantive offense. It pointed out that in the latter situation the People are not required to prove all of the elements of a conspiracy.
[3] Defendant contends that the court's explanation allowed the jury to find him guilty as a principal in the robbery and murder under a conspiracy theory even though all the elements of a conspiracy were not proved. Although the court's explanation was confusing, we do not believe that when it is considered in the light of all of the instructions given, it would be understood to mean that defendant could be found guilty on a conspiracy theory in the absence of proof that he was a principal in the robbery and murder. The jury was instructed that defendant could be found guilty if he personally robbed and murdered Mr. Kay, if he aided and abetted Mrs. Spencer or Davis or both in committing those crimes, or if he conspired with Mrs. Spencer or Davis or both to commit those crimes. Under any of these theories the jury could have found defendant guilty only if it found the crimes were committed and that defendant participated therein by committing them himself or by aiding and abetting the others to commit them, either directly or by entering into a conspiracy to commit them. In this setting, the court's explanation meant, not that defendant could be found guilty of substantive crimes he did not commit, but only that the People *1176 were not required to prove all of the elements of a conspiracy if the jury otherwise believed that defendant was a principal in the robbery and murder.
[4a] Defendant contends that the trial court erred in admitting into evidence statements made by Mr. Kay to a nurse shortly after he was taken to a hospital. The trial court admitted the statements over objection under the spontaneous statement exception to the hearsay rule. (Evid. Code, § 1240.) Mr. Kay was unconscious when he arrived at the hospital about 45 minutes after the crime was committed. An officer asked the emergency room nurse to ask Mr. Kay what happened to him. He did not respond to her initial inquiries, but in about 20 minutes he regained consciousness for three or four minutes. The nurse again asked him what happened to him, and he said either "I was beaten" or "I was robbed." She then asked him if he knew who had done it and he replied "no." She then asked, "Was there more than one person involved?" and he said, "There was more than one." "Was there two involved?" she inquired, and he replied, "Maybe two or three." There was a pause of about 30 seconds between each question and the reply.
Section 1240 of the Evidence Code provides: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception." The section codified an existing exception to the hearsay rule (Law Revision Commission Comment to § 1240), which was carefully restated in Showalter v. Western Pac. R.R. Co. (1940) 16 Cal.2d 460, 468 [106 P.2d 895]. To be admissible, "(1) there must be some occurrence startling enough to produce ... nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it. (Wigmore on Evidence, [2d ed.], sec 1750.)"
[5] Neither lapse of time between the event and the declarations nor the fact that the declarations were elicited by questioning deprives the statements of spontaneity if it nevertheless appears that they were made under the stress of excitement and while the reflective powers were still in abeyance. *1177 (Lane v. Pacific Greyhound Lines (1945) 26 Cal.2d 575, 583 [160 P.2d 21]; People v. Costa (1953) 40 Cal.2d 160, 168 [252 P.2d 1]; Showalter v. Western Pac. R.R. Co., supra, 16 Cal.2d 460, 467; Wiley v. Easter (1962) 203 Cal. App.2d 845, 854 [21 Cal. Rptr. 905].) [4b] In the present case Mr. Kay was unconscious for most of the time between the beating and the nurse's questions. (See People v. Costa, supra.) He had suffered brain damage and was having difficulty breathing. The evidence supports the trial court's findings that Mr. Kay did not have power to reflect on his answers and that the slowness of his responses resulted, not from reflection, but from his critical physical condition. Accordingly, the trial court did not err in ruling that the statements were admissible under section 1240. (See Showalter v. Western Pac. R.R. Co., supra, 16 Cal.2d 460, 468-469; Ungefug v. D'Ambrosia (1967) 250 Cal. App.2d 61, 67 [58 Cal. Rptr. 223]; People v. Fain (1959) 174 Cal. App.2d 856, 861 [345 P.2d 305]; 6 Wigmore, Evidence (3d ed. 1940) § 1750, p. 154; Witkin, Evidence (2d ed. 1966) § 547, p. 520.) [6] Moreover, that decision was for the trial court alone to make, and it therefore did not err in failing to instruct the jury to disregard the statements if the jury found them not to have been spontaneous within the meaning of section 1240. (Evid. Code, § 405; People v. Cruz (1968) 264 Cal. App.2d 350, 360, fn. 11 [70 Cal. Rptr. 603]; cf. People v. Bazaure (1965) 235 Cal. App.2d 21, 38 [44 Cal. Rptr. 831], stating rule applicable before the adoption of the Evidence Code.)
[7] Defendant contends that seven prospective jurors were excused for cause in violation of Witherspoon v. Illinois (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]. We need not canvass the entire group cited by defendant, for it is clear that at least one venireman was excused in violation of the standards set forth in that case. (See People v. Bradford (1969) 70 Cal.2d 333, 345-346 [74 Cal. Rptr. 726, 450 P.2d 46].)
Venireman Norbert Elsner twice indicated on the first day of voir dire that he could vote for the death penalty, though he would be loath to do so on circumstantial evidence alone unless that evidence were "very strong." On the second day the following colloquy took place between Mr. Elsner and the bench.
"PROSPECTIVE JUROR ELSNER: Your Honor, I have certain reservations where I can't vote for taking a man's life.
*1178 "THE COURT: Do you feel your responses to the Court yesterday were not 
"PROSPECTIVE JUROR ELSNER: They were in truth yesterday. Its just that I have given it more thought. I had never thought about it as being a personal responsibility in this case. I seem to be going the other way today. Up to this point I had never thought I was against capital punishment, but for some reason I tend to be drifting that way. The answers I gave the prosecuting attorney yesterday I think were 
"THE COURT: Are you satisfied at this time in your own mind that you entertain a conscientious opinion with reference to the death penalty?
"PROSPECTIVE JUROR ELSNER: I feel I would be hesitant to vote for a death penalty.
"THE COURT: All right. You may be excused, Mr. Elsner."
Witherspoon held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." (391 U.S. at p. 522 [20 L.Ed.2d at p. 784].) In the instant case Elsner did not even indicate that he objected to the death penalty, but only that he was "drifting that way." His feeling that he would be "hesitant" to impose the death penalty is one undoubtedly shared by many who would nevertheless impose it in some cases. (See, e.g., Witherspoon v. Illinois, supra, 391 U.S. 510, 515, fn. 8 [20 L.Ed.2d 776, 781, 88 S.Ct 1770]; People v. Bradford, supra, 70 Cal.2d 333, 346.) Elsner's statements did not make it "unmistakably clear (1) that [he] would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial ... or (2) that [his] attitude toward the death penalty would prevent [him] from making an impartial decision as to the defendant's guilt." (391 U.S. at p. 522, fn. 21 [20 L.Ed.2d at p. 785].)
The judgment is reversed insofar as it relates to the penalty on the conviction for murder. In all other respects the judgment is affirmed.
Peters, J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.
McCOMB, J.
I would affirm the judgment in its entirety.
Appellant's petition for a rehearing was denied November 12, 1969.
NOTES
[1] The relevant part of the record reads as follows:

"No agreement amounts to a criminal conspiracy in California unless in addition to entering into the unlawful agreement an overt act is done within this state by one or more of the conspirators for the purpose of accomplishing the object of the agreement. The law requires that at least one of such overt acts be expressly alleged, and that in addition to proof of the criminal agreement between the parties, at least one of the overt acts thus alleged must be proved to support a conviction for conspiracy.
"Gentlemen, let me discuss this instruction for just a moment.
"[The following proceedings were held at the bench out of the hearing of the jury:]
"THE COURT: Unfortunately I did not edit this instruction, but I see now it relates to the crime of conspiracy. This defendant isn't charged with the crime of conspiracy. I will have to change it. I think the purpose of this instruction is to indicate the overt act, what an overt act is, and I think I had better interpolate at this time. I do not think this is a proper instruction.
"[The following proceedings were held in open court within the presence and hearing of the jury:]
"THE COURT: I told you just a few moments ago that no agreement amounts to a criminal conspiracy in California unless in addition to entering into the unlawful agreement an overt act is done.
"Let me state this to you: As you will recall, in the indictment the defendant is not charged with the crime of conspiracy. It may well be that the evidence discloses a conspiracy. This does not require, for example, that the People prove all the elements of a conspiracy if it were charged as such. It is not so charged. I did, however, make reference to an overt act in the matter of conspiracy. Let me define that for you."
The court proceeded to correctly define overt acts.