[Crim. No. 13773. Third Dist. Mar. 12, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
CARLOS THOMAS GARCIA, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts I, III and IV.

■■■■■■■
■■■■■■■■■■

COUNSEL

Allen R. Crown, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, W. Scott Thorpe and Michael J. Weinberger, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

SPARKS, J.—Defendant Carlos Thomas Garcia, also known as Charles Thomas Slatten, was found guilty by a jury of one count of murder in the second degree (Pen. Code, § 187, 189), in the commission of which he personally used a firearm (Pen. Code, § 12022.5). He admitted one prior conviction for a robbery, a serious felony within the meaning of Penal Code section 667. In the published portion of this opinion we consider defendant's contention that the trial court erred in admitting into evidence hearsay statements made by the victim shortly before he was fatally shot. We find that contention, and the remaining ones considered in the unpublished portion, to be unpersuasive and consequently shall affirm the judgment.

### FACTS

For a number of years before his death the victim, Kelvin Boney, had been married to Barbara Bustos. At the time of his death Boney and Barbara had separated and were in the process of a dissolution. For approximately the same period of time defendant had been involved in a meretricious relationship with Georgina Bustos, the sister of Barbara. Shortly before the incident in question they also had separated. Boney had moved into the apartment of Judy Masten and they planned to marry. Defendant continued to live in his house in Roseville.

On the afternoon of July 18, 1983, defendant paid a visit to Boney at Masten's apartment in Sacramento. Defendant, Boney, and Masten spent the afternoon talking and drinking.[1] Between 7 and 8 p.m., defendant and

---

[1] In fact, the evidence was conflicting whether Boney was drinking at that time. Masten testified that she and defendant were drinking and that Boney was not. Defendant testified that Boney was drinking but that he was concealing it from Masten. The autopsy surgeon testified that he concluded that Boney's blood alcohol level at the time of his death was approximately .14 percent. It was uncertain whether that was attributable to an afternoon of steady drinking, or a period of more concentrated drinking after defendant and Boney left Masten's apartment.

Boney left Masten's apartment. Masten testified that defendant wanted them to go to Roseville and Boney wanted her to go, but that she told Boney she did not want to go. She went to get her purse and saw defendant's car leave with Boney in the passenger seat. By defendant's own concession, he and Boney then went to defendant's residence in Roseville.

At some time between 9:30 and 11:30 p.m., Boney telephoned Anthony Rodriguez, who was the boyfriend of Masten's daughter. Boney wanted a ride from Roseville to Sacramento. Rodriguez refused to give him a ride but, since Masten did not have a telephone, he agreed to take a message to her. Boney gave defendant's telephone number to Rodriguez and asked him to tell Masten to call him. Rodriguez delivered the message.

Masten went to a pay telephone and called the number Rodriguez had given her. Boney answered and asked her to come and get him. He exclaimed, "Carlos went crazy and he's going to shoot me." He told Masten to bring a gun. Masten obtained an address from Boney. She attempted to get directions, but heard some angry yelling and then the telephone went dead. The address Masten had obtained was erroneous. She had written 323 D Street, while defendant actually lived at 232 D Street. Masten drove around for several hours but was unable to find her way there. She attempted to call defendant's number but received no answer. She called Antonia Bustos, the mother of Barbara and Georgina, and told her about the call from Boney. Antonia confirmed that Masten had the wrong address, but told her no more. Eventually Masten went to her son's house where she stayed the night.

The next morning, defendant's mother, who lives in southern California, received a telephone call from defendant. He said he was at the San Diego airport and asked her to pick him up. Shortly thereafter she received a call from Georgina Bustos, who asked whether she had heard from defendant. She confirmed that she had and that he was at the airport. After confirming that defendant was away, Georgina went to his house to get some of her things. There she discovered the body of Boney. Boney had died from a small caliber shot to the chest. Expert testimony established that the death weapon was fired from close range, probably about six inches. The death weapon, which belonged to defendant, was found in the yard near his house.

Defendant admitted involvement in Boney's death, but he claimed that it was an accident. He testified that they drank and talked at his house. The talk turned to guns and defendant told Boney he had purchased a pistol. Boney asked to see it and defendant retrieved it from his bedroom. As defendant held it out to him, Boney grabbed the gun and said, "give me that gun." As Boney pulled the gun towards himself it accidentally dis-

charged. Defendant realized that Boney had died and he was devastated. He then decided to go to his mother's house because she was the only one in the world he trusted.

Based upon this scenario the jury found defendant to be guilty of one count of second degree murder (Pen. Code, § 187) with a finding that he personally used a firearm in the offense (Pen. Code, § 12022.5). After waiving a jury trial on the issue, defendant admitted the prior conviction for robbery (Pen. Code, § 211) in a hearing before the court.

DISCUSSION*

I

. . . . . . . . . . . . . . . . . . . . . . . .

II

 Defendant contends that the trial court erred in permitting the prosecution to introduce Boney's statements to Masten during the telephone call. As we have recounted, Masten testified that the victim told her defendant had "gone crazy" and was going to shoot him. He instructed her to come and get him and to bring a gun. Masten heard some angry yelling and the telephone went dead. The People sought to introduce the statements as spontaneous declarations of the victim, and to establish his state of mind to negate any claim of accident. Defendant objected that the statements were inadmissible hearsay. Initially the trial court indicated that it would overrule the objection. However, after reflecting on the state of mind exception to the hearsay rule, the court decided to allow the case to progress before ruling and directed the prosecutor to avoid reference to the statements until later in the case. After defendant established through cross-examination that the victim was a "tough guy," who became unpredictable and violent when drinking, the court allowed the evidence to be admitted. That ruling is now challenged on appeal.

Initially, we note that the prosecution sought to introduce Boney's statements on a theory upon which they were clearly admissible, namely as spontaneous declarations. Evidence Code section 1240 provides: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the

---

*See footnote, page 814, *ante.*

declarant was under the stress of excitement caused by such perception."

■ This section incorporated part of what was formerly known as the res gestae exception to the hearsay rule. (Witkin, Cal. Evidence (2d ed. 1966) The Hearsay Rule, § 544, p. 517.) As Witkin notes, California has now adopted Wigmore's terminology in place of res gestae and "statements coming under this exception are properly described as 'spontaneous exclamations,' 'spontaneous declarations,' or 'spontaneous statements.'" (Witkin, *op. cit. supra,* at p. 517.) In *People* v. *Washington* (1969) 71 Cal.2d 1170, 1176 [81 Cal.Rptr. 5, 459 P.2d 259], the Supreme Court observed that Evidence Code section 1240 "codified an existing exception to the hearsay rule (Law Revision Commission Comment to § 1240), which was carefully restated in *Showalter* v. *Western Pac. R.R. Co.* (1940) 16 Cal.2d 460, 468 [106 P.2d 895]. To be admissible, '(1) there must be some occurrence startling enough to produce . . . nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstances of the occurrence preceding it. (Wigmore on Evidence, [2d ed.], sec 1750.).'"

■ The time which has elapsed between the event and the statement is an important factor because a spontaneous statement must be made under the immediate influence of the event so as to negate any probability of reflection or fabrication. (*People* v. *Washington, supra,* 71 Cal.2d at pp. 1176-1177; *Showalter* v. *Western Pacific R. R. Co.* (1940) 16 Cal.2d 460, 469 [106 P.2d 895]; *Wiley* v. *Easter* (1962) 203 Cal.App.2d 845, 854 [21 Cal.Rptr. 905].)[4] In general, the closer in time the declaration is to the event to which it refers the less likely it is to be the product of reflection and fabrication. (*Ibid.*)[5]

---

[4]In *People* v. *Washington, supra,* 71 Cal.2d 1170, the severely beaten victim of a robbery was taken to a hospital in an unconscious condition. About an hour after the crime, the victim regained consciousness shortly before his death and in answer to a nurse's questions stated that he had been beaten or robbed by two or three assailants. The *Washington* court held that "[n]either lapse of time between the event and the declarations nor the fact that the declarations were elicited by questioning deprives the statements of spontaneity if it nevertheless appears that they were made under the stress of excitement and while the reflective powers were still in abeyance." (*Id.,* at p. 1176.) Nonetheless, the statutory requirement that the statement be made while the declarant is under the stress of the excitement caused by the perceived event "has been construed to introduce a very tight time limitation on out-of-court declarations which [the] parties seek to qualify as 'spontaneous exclamations.'" (*In re Cheryl H.* (1984) 153 Cal.App.3d 1098, 1130 [200 Cal.Rptr. 789].)

[5]As *Jefferson* explains, "The spontaneous-statement hearsay exception is designed to admit a statement made spontaneously under the stress of excitement caused by an exciting or startling act or event and that describes this act or event. The theory of trustworthiness is predicated on the startling or exciting nature of the act observed and on the spontaneity of

█ It is rare, but not unknown, for there to be available spontaneous declarations made during the very transaction at issue. Because of this rarity, most of the cases have been concerned with declarations made shortly after the event. █ Excited statements made close in time to the event are generally regarded as admissible. (See *People* v. *Francis* (1982) 129 Cal.App.3d 241, 254 [180 Cal.Rptr. 873]; *People* v. *Williams* (1980) 102 Cal.App.3d 1018, 1032-1033 [162 Cal.Rptr. 748]; *People* v. *Forgason* (1979) 99 Cal.App.3d 356, 365 [160 Cal.Rptr. 263]; *People* v. *Panky* (1978) 82 Cal.App.3d 772, 779 [147 Cal.Rptr. 341]; *People* v. *Orduno* (1978) 80 Cal.App.3d 738, 745-746 [145 Cal.Rptr. 806].) █ And a statement made contemporaneously with one criminal event has been regarded as "clearly admissible" in a prosecution for a subsequent crime. (*People* v. *Worthington* (1974) 38 Cal.App.3d 359, 366-367 [113 Cal.Rptr. 322].) In *Worthington* the defendant was charged with murdering a mother and child. Two days before the killings a witness had heard the mother angrily order the defendant out of the daughter's bedroom saying, " 'He's trying to go down on my daughter.' " The statement was admitted to prove the defendant had been trying to molest the daughter and thus to establish his motive at the time of the killings. (*Ibid.*)

Here the statements were virtually the victim's last words before he was murdered. The evidence in this case established that the defendant and Boney were together at defendant's home. Boney sent a message to his fiance and when she returned his call he sounded frightened. He said defendant had gone "crazy" and was going to shoot him. He asked her to come and get him and to bring a gun. Before she could obtain directions to defendant's house Masten heard angry yelling and the telephone line went dead. The telephone was located in the kitchen. The following morning Boney was found on the kitchen floor shot through the chest by defendant's gun. The bullet perforated Boney's heart and quickly caused death. A spent .22 caliber casing was found by the investigating officers in the kitchen. The investigation revealed no indication of a struggle between Boney and his killer. In the meanwhile defendant had fled to southern California. Under these circumstances it is apparent that Boney's excited utterance was contemporaneous with the transaction which led to his death and while his reflective powers were still in abeyance. The statement was therefore a spontaneous declaration admissible under Evidence Code section 1240.

█ Moreover, we agree with the People that it was also within the trial court's discretion to admit the statements to show the victim's state of

---

the statement made under the stress of excitement produced by declarant's observation of that act or event. Such a statement, made before declarant has had time to think or deliberate on what he is saying, is deemed sufficiently reliable to take it out of the inadmissible hearsay category." (1 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) Spontaneous Statements and Contemporaneous Statements, § 13.1, p. 369.)

mind.[6] ■ "Undoubtedly, in a proper case, and in a proper manner, testimony as to the 'state of mind' of the declarant, where there is an issue in the case is admissible, but only when such testimony refers to threats as to future conduct on the part of the accused, where such declarations are shown to have been made under circumstances indicating that they are reasonably trustworthy, and when they show primarily the then state of mind of the declarant and not the state of mind of the accused." (*People* v. *Hamilton* (1961) 55 Cal.2d 881, 893 [13 Cal.Rptr. 649, 362 P.2d 473].) Statements by a victim concerning the defendant's prior conduct such as threats made to him tend to establish the victim's state of mind towards the defendant, namely, fear of him, and may be admitted where that state of mind is in issue. (*People* v. *Armendariz* (1984) 37 Cal.3d 573, 588 [209 Cal.Rptr. 664, 693 P.2d 243].) Such statements are not admitted to show the truth of the matter asserted, that the threats were made, or the defendant's conduct in conformity therewith. They are instead admitted to show the victim's conduct in conformity with his state of mind. (*Ibid.*) For example, where the defendant claims self defense or that the killing was accidental, then statements by the victim showing his fear of the defendant may be admitted to show that the victim would not likely have been an aggressor against the defendant or would not likely have allowed himself to be in the position in which the defendant claims the accident occurred. (See *People* v. *Lew* (1968) 68 Cal.2d 774, 779-780 [69 Cal.Rptr. 102, 441 P.2d 942].)

■ In determining whether to admit the evidence to show Boney's state of mind the trial court was initially cautious. Later in the case, however, it became apparent that the defense was attempting to portray Boney as a "tough guy" with a bad temper who could become violent and unpredictable, especially while drinking. The court ruled that "the line has been crossed" and that the defense had put in issue Boney's conduct, demeanor and actions. We find no abuse of discretion in this ruling. At the point the court ruled that the evidence could be admitted the defense was obviously attempting to show that Boney's behavior caused or contributed to his death. His fear of defendant, shown by his statements to Masten, would tend to negate the possibility that he would have been aggressive with defendant or that he would have asked defendant to get his pistol from the bedroom.

---

[6]The state of mind exception to the hearsay rule is found in Evidence Code section 1250. That section provides: "(a) Subject to Section 1252, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant. [¶] (b) This section does not make admissible evidence of a statement of memory or belief to prove the fact remembered or believed."

Section 1252 precludes the admission of such a statement if it was made under circumstances which indicate a lack of trustworthiness.

Defendant complains that the court failed to give the jury an instruction limiting the use of the evidence to its use as proof of the victim's state of mind. We agree with the People that the failure to request a limiting instruction precludes defendant from raising this issue on appeal. (See *People v. Richards* (1976) 17 Cal.3d 614, 618-619 [131 Cal.Rptr. 537, 552 P.2d 97].) We reject defendant's suggestion that it would have been futile to request a limiting instruction. During the original discussion, when the court indicated it would admit the evidence, the court invited counsel to suggest a limiting instruction. The court then changed its ruling and excluded the evidence until later in the case when the state of the evidence supported its admission. When the court allowed the evidence to be presented defendant did not request a limiting instruction. There was no reason for defendant to believe the court would have refused a limiting instruction had he suggested one, as the court had earlier invited him to do.

In any event, we have noted that the evidence was admissible under the spontaneous declaration exception to the hearsay rule. (Evid. Code, § 1240.) Statements admitted under that rule are generally admissible and are not limited to a specific purpose. Although the court failed to rule on the People's offer of the evidence under section 1240, our conclusion that the evidence was admissible under that section compels us to conclude that there was no reversible error in failing to limit the use of the evidence when it was admitted to show the victim's state of mind. (See *People v. Braeseke* (1979) 25 Cal.3d 691, 700-701 [159 Cal.Rptr. 684, 602 P.2d 384].)

III-IV*

. . . . . . . . . . . . . . . . . . . . . . .

The judgment is affirmed.

Puglia, P. J., and Regan, J., concurred.

---

*See footnote, page 814, *ante.*