Filed 8/16/16  P. v. Bennett CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B262735 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA099654) |
| v. | |
| VIRGINIA RUTH BENNETT, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Jesus Rodriguez, Judge.  Remanded in part with directions; affirmed in part.

Stephen M. Vasil, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Michael R. Johnsen, Alene Games and Heather Arambarri, Deputy Attorneys General, for Plaintiff and Respondent.

**INTRODUCTION**

Defendant Virginia Bennett appeals from her conviction for inflicting corporal injury on her live-in boyfriend, Freddie Morris. She claims the trial court erroneously admitted a 911 call by a witness to the incident. We conclude that the court did not abuse its discretion in ruling the statements made on the 911 call were admissible under the spontaneous statement exception to the hearsay rule. We therefore affirm the conviction. However, we agree with the parties that defendant is entitled to two additional days of presentence custody credit. We accordingly remand to the trial court with directions to correct the abstract of judgment.

**PROCEDURAL HISTORY**

The Los Angeles County District Attorney (the People) filed an information on August 12, 2014 charging defendant with one count of willful infliction of corporal injury on her cohabitant, Morris. (Pen. Code, § 273.5, subd. (a).) The information further alleged that defendant used a cane as a deadly weapon (Pen. Code, § 12022, subd. (b)(1)), and inflicted great bodily injury upon Morris under circumstances involving domestic violence (Pen. Code, § 12022.7, subd. (e)). In addition, the information alleged sentencing enhancements based on defendant's prior strike conviction (Pen. Code, §§ 667, subd. (d), 1170.12, subd. (b)), prior serious felony conviction (Pen. Code, § 667, subd. (a)(1), and three prior prison terms (Pen. Code, § 667.5, subd. (b)).

The jury found defendant guilty as charged and further found the deadly weapon and domestic violence allegations true. Defendant admitted the prior conviction allegations.

The court sentenced defendant to the upper term of 19 years in state prison and awarded 282 days of presentence custody credit. Defendant timely appealed.

**FACTUAL BACKGROUND**

The People's theory was that defendant and Morris got into an argument about Morris's fidelity and defendant hit Morris on the head with his cane. The following

2

evidence was adduced at trial.

A.     *Morris's testimony*

Defendant and Morris were dating and living together in an apartment on Main Street in Long Beach. Morris was 64 years old and legally blind in his left eye; he used a white metal cane to get around.

Morris started drinking in the morning on July 13, 2014 after he learned of the death of a family member. He drank four pints of vodka and a few shots of brandy over the course of four to six hours. He and defendant began to argue about his alcohol use and their relationship. Morris testified that he pushed defendant during that argument, while they were inside their apartment. He denied threatening defendant. Morris left the apartment and headed to the store to buy more alcohol. He claimed that he did not recall whether defendant followed him outside. He also claimed he did not recall how he was injured because he "was drunk at the time," and "whatever happened happened." Morris testified that he thought he fell and hit his head "on the side of a building" near his apartment. He denied telling police that defendant hit him with his cane during their argument. When asked whether defendant hit him, he responded "I don't know. I can't say." He also said he was "drunk all of the time the whole day."

B.     *Testimony from other percipient witnesses*

Rosa Almanza witnessed the incident from a passing car. She was sitting in the front passenger seat of a car driving down Main Street. As the car approached the scene, she saw defendant walking toward Morris. Morris was sitting on a staircase in front of a building, about six feet away from Almanza; defendant was 12 to 13 feet away. Defendant was holding Morris's cane and was walking quickly toward Morris. Morris did not yet appear to be injured. Almanza screamed at Morris to alert him that defendant was "going to hit him." She could hear defendant yelling but could not understand what she was saying.

After the car passed where Morris was sitting, the driver began to make a U-turn to park on the other side of the street. As the car was turning, Almanza looked over her

3

shoulder and saw defendant hit Morris on the top of his head with the cane. She saw that Morris's head began to bleed and she called the police. She did not see Morris hit or threaten defendant.

Angela Cristobal lived across the street. She was in her apartment, looked outside, and saw Morris standing across the street, bleeding. She also saw defendant standing a few feet from Morris. She heard Morris say "bitch, you just hit me." Morris's cane was on the ground.

C. *911 call from Maria*

The police department received three 911 calls regarding this incident. A caller identified only as "Maria" called at 4:02 p.m. Maria was unavailable for trial. Instead, the People introduced the audio recording and written transcripts of her 911 call.

At the beginning of the call, Maria asked the operator to send paramedics. The operator asked what happened and Maria responded that "[s]ome lady just hit an old man with uh, uh, a stick and his head is bleeding real bad." Maria then gave their location, followed by this exchange:

Operator: Is he outside?

Caller: Yes, he's outside and he's bleeding a lot in his head.

Operator: Stay on the phone with me, okay?

Caller: Oh, my God . . . he . . . they're black . . . and the lady's still coming.

In response to the operator's questions, Maria then provided a description of defendant and the victim. She also stated that she was in her car "waiting for my husband to come out of an apartment, but I saw everything."

D. *Emergency personnel*

Long Beach Police Officer Jeannie Villanueva responded to the scene of the incident. Morris was standing outside with blood coming from his head and running down his face. Defendant was sitting nearby. Villanueva asked Morris what happened and he said "she hit me," pointing to defendant. Defendant told Villanueva that Morris

4

was drunk and fell and hit his head. Officer Villanueva also noticed the cane on the ground with blood on it, as well as several large drops of blood on the sidewalk.

Villanueva arrested defendant and transported her to the police station. She did not see any injuries on defendant. Morris was transported to the hospital. Two officers interviewed Morris at the hospital over the course of the afternoon and evening of the incident. Both testified that Morris was intoxicated and smelled of alcohol, but was alert.

Morris told the officers that he and defendant had been drinking and began to argue because defendant believed he was cheating on her. Defendant took his cane and hit him on the head several times; he then felt blood flowing down his face. Morris told one of the officers that, while she was hitting him, defendant said "I ought to kill you. I will hurt you real bad." Morris had no apparent injuries to his arms, hands, or legs.

Dr. Mark Joyner treated Morris in the emergency room in the afternoon on July 13, 2014. Morris had a three- and-a-half-inch laceration on the top of his head with some bleeding, as well as abrasions on the right side of his face, near his eyebrow and eye. The laceration was consistent with blunt force trauma to the head. Joyner said that Morris "smelled a little bit of alcohol" and was slurring his speech " a little bit," but was generally "awake and alert," not "really altered."

Morris told Dr. Joyner that he thought someone hit him on the back of the head. He initially said he could not remember who had hit him, but later said it was a female.

E. *Defendant's testimony*

Defendant testified at trial on her own behalf. She was 49 years old at the time of trial and had been dating Morris for four or five years. She testified that Morris started drinking early in the morning on the day of the incident. They started arguing, and Morris "pushed me, he grabbed me," then he "swung at me twice." This occurred inside their apartment. Morris then stumbled and fell while inside, scratching his face "from the carpet."

Defendant testified that Morris then "staggered downstairs" and went to get more alcohol. Defendant remained inside for a few minutes, but started to have a panic attack

5

and went outside for some air. Once outside, defendant and Morris started arguing again. Defendant told Morris she was "going to leave his ass," and Morris responded by insulting and threatening her. Morris then "took his cane and he swung at me" several times, hitting her once in the leg. After he hit her leg, Morris raised the cane again, at which point defendant "snatched it from him" and "hit him with it." Defendant claimed it was "like a reflex." Morris's head started bleeding and someone called the police.

Defendant admitted she did not initially tell the police the truth about what happened because she "didn't want Freddie to get in trouble." She also testified that Morris had been violent on prior occasions, claiming that when Morris drank, "he turned into another person."

During cross-examination, defendant admitted she had been convicted in 2003 of stabbing someone with a knife.

F.     *Rebuttal*

In rebuttal, Officer Villanueva provided some details of the statements originally given by defendant on the day of the incident that conflicted with defendant's testimony at trial. At the scene, defendant told Officer Villanueva that she had not hit Morris at all and he fell down because he was drunk. However, when she was interviewed later that day following her arrest, defendant stated Morris hit her with the cane once and she then took it and hit him twice on the leg. She did not say she hit Morris on the head.

## DISCUSSION

### I.     Admission of 911 Call

Defendant asserts that the trial court erred in admitting the statements made by "Maria" during her 911 call because the statements do not qualify for admission under the spontaneous statement exception to the hearsay rule. (Evid. Code, § 1240.)[1] She further contends this error violated her due process rights and deprived her of a fair trial. We find no error.

_____

[1] All further statutory references are to the Evidence Code unless otherwise indicated.

6

A.    *Background*

Prior to trial, the People moved to admit the 911 call by "Maria" as hearsay subject to an exception, either as a spontaneous statement (§ 1240) or as a business record (§ 1271).  Defense counsel objected based on foundation, hearsay, and as cumulative under section 352 because there were other witnesses who saw the incident.[2]

The court held a hearing on the foundation for the authenticity of the call, based on testimony from the custodian of records for the 911 system.[3]  The court also listened to the audio from the call.

The court granted the People's motion to admit the call.  The court found the statements made by the 911 caller admissible as spontaneous statements, stating that "by reading the transcript and by listening to the recording . . . the court is convinced this is a spontaneous statement made at the time, made contemporary with the actions that the caller is making [sic]."  The court noted it was "obviously an excited utterance when she says, 'oh, my god.  And the lady is coming again to hit him.'  Even though there are no exclamation points or symbols, this is definitely what appears to be an excited utterance."

The court further found the call was not cumulative under section 352, because Maria saw the incident "happening, sees the action taking place," and was not unduly prejudicial.

However, the court ordered two statements from the call stricken as speculative.  First, the court revised the statement "the lady's still coming to hit him" to read "the lady's still coming."  Second, the court struck a statement made toward the end of the call:  "it looks like she's going to hit him again."  The prosecutor omitted the excluded

---

[2] Defense counsel also objected that the statements were testimonial and therefore should be excluded pursuant to *Crawford v. Washington* (2004) 541 U.S. 36, 59.  The trial court disagreed, concluding that the call "is not even close to being testimonial in nature."  Defendant has not raised a *Crawford* objection on appeal.

[3] After the call was admitted, the custodian testified before the jury regarding the collection and retention of the 911 records.

statements when he played the audio of the call for the jury; he also redacted them from the written transcript by crossing them out.

B.    *No Error in Admission of Call*

Defendant contends the statements in Maria's 911 call do not qualify as spontaneous statements and therefore were inadmissible hearsay. In particular, she suggests that the caller's voice appeared to be calm and that her statements were made in response to questioning by the 911 operator. We disagree.

"'Evidence of a statement is not made inadmissible by the hearsay rule if the statement:  [¶]  (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶]  (b) was made spontaneously while the declarant was under the stress of excitement caused by such perception.'"  (§ 1240.)  In order to qualify under this exception, "'(1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it.'  [Citations.]"  (*People v. Poggi* (1988) 45 Cal.3d 306, 318 (*Poggi*).)

"Because the second admissibility requirement, i.e., that the statement was made before there was '"time to contrive and misrepresent,"' 'relates to the peculiar facts of the individual case more than the first or third does [citations], the discretion of the trial court is at its broadest when it determines whether this requirement is met.'  [Citation.]" (*People v. Lynch* (2010) 50 Cal.4th 693, 752, abrogated on other grounds by *People v. McKinnon* (2011) 52 Cal.4th 610.)  "In considering admissibility under this requirement, the court considers a variety of factors to determine the mental state of the declarant. [Citation.]  These factors include the length of time between the startling occurrence and the statement, whether the statement was blurted out or made in response to questioning, how detailed the questioning was, whether the declarant appeared excited or frightened,

8

and whether the declarant's 'physical condition was such as would inhibit deliberation.' [Citations.]" (*Lynch*, *supra*, 50 Cal.4th at p. 752.) We review the trial court's admission of evidence as a spontaneous hearsay statement for an abuse of discretion. (See, e.g., *Poggi*, *supra,* 45 Cal.3d at p. 318.)

Applying these factors here, we cannot say that the trial court abused its discretion in admitting the call as a spontaneous statement.[4] Crucially, it is evident from Maria's statements during the call that she had witnessed defendant hit Morris only moments before, and was still watching the incident while speaking with the 911 operator. She told the operator that defendant had "just" hit Morris, that he was bleeding heavily, and then exclaimed "oh my God" and told the operator it looked like defendant was still coming. These statements were made by an eyewitness immediately following an assault, where the witness observed serious injuries to the victim and then continued to watch interactions between the perpetrator and the victim. Under these circumstances, the court was well within its discretion to conclude that the witness remained under the stress of the incident at the time of the call. Indeed, it is difficult to conceive how Maria could have had time to reflect or to contrive her statements, given the ongoing nature of the events she was witnessing as she made the call.

Defendant notes that the witness was not crying and sounded fairly calm during the call as factors indicating that she was no longer under any stress from the incident. We do not find this persuasive. Although the extent of a declarant's excitement or fright is a relevant consideration, statements by a relatively calm declarant should not be excluded automatically. (See *Poggi, supra,* 45 Cal.3d at p. 319 ["[T]he fact that the

---

[4] The Attorney General also suggests that the call was admissible under the business records exception to the hearsay rule (§ 1271). Defendant does not challenge on appeal the authenticity or admissibility of the recording itself as a business record, as established by the testimony of the records custodian. However, the statements made by Maria during the call were offered for their truth and therefore present a separate layer of hearsay that would not be admissible as a business record. Thus, we reject the Attorney General's unsupported suggestion that the *contents* of the call could be admitted under section 1271.

declarant has become calm enough to speak coherently [] is not inconsistent with spontaneity."].)  Moreover, the evidence demonstrates that Maria was not entirely dispassionate.  She exhibited obvious concern for Morris's well-being, asking immediately for an ambulance and remarking several times at the extent of his bleeding.  In addition to uttering "oh, my god," as noted by the trial court, her statements on the call are short, disorganized, and she sounds at least somewhat nervous.

Further, although some of Maria's statements were made in response to questions by the 911 operator, these questions were general—asking what happened—rather than pointed or leading.  (See *People v. Farmer* (1989) 47 Cal.3d 888, 904, overruled on other grounds as noted by *People v. Waidla* (2000) 22 Cal.4th 690, 724, fn. 6 [statements in response to questioning admissible where "responses were not self-serving," nor were "the questions suggestive"].)  Thus, we do not find this factor weighs strongly against admission.  (See *People v. Brenn* (2007) 152 Cal.App.4th 166, 173 [admitting statements by victim in response to questioning within minutes of stabbing]; *People v. Farmer*, *supra*, 47 Cal.3d at p. 904 ["an answer to a simple inquiry has been held to be spontaneous"]; *People v. Washington* (1969) 71 Cal.2d 1170, 1176 ["the fact that the declarations were elicited by questioning [does not] deprive[] the statements of spontaneity if it nevertheless appears that they were made under the stress of excitement and while the reflective powers were still in abeyance"].)

Such concerns weigh more heavily in cases where substantial time has elapsed between the incident and the statements.  In those circumstances, courts have examined quite closely the demeanor and physical condition of the declarant, as well as the extent of questioning, given the increased risk that the declarant has had time to reflect on his or her statements.  (See, e.g., *Poggi*, *supra,* 45 Cal.3d at p. 319 [admitting statements by victim to police about 30 minutes after attack, where victim extremely agitated and bleeding profusely from stab wounds]; *People v. Farmer*, *supra*, 47 Cal.3d at p. 904, [victim was "not merely an uninjured witness whose excitement might wane"]; *People v. Francis* (1982) 129 Cal.App.3d 241, 254 [admitting statement made within 20 minutes of

10

stabbing under circumstances indicating emotional and physical stress and shock].) Here, where the 911 call was made contemporaneously with the incident, it was not an abuse of discretion for the trial court to find Maria's statements sufficiently spontaneous to qualify as a hearsay exception.

Defendant also offers her interpretation of the declarant's speech pattern ("uptalking"), her pauses during the conversation, and her statement that she "saw everything" as evidence that Maria was considering her statements as she made them. While these might be credible bases for a trial court to conclude in the first instance that a statement was insufficiently spontaneous, it is not our job to reweigh the evidence or to make that factual determination. (See, e.g., *Poggi, supra,* 45 Cal.3d at p. 319 [the "discretion of the trial court is at its broadest" in determining the mental state of the declarant].) Nor do we agree that there is no other reasonable conclusion that could be drawn from this evidence. From our review of the 911 call, we conclude it is equally, if not more, plausible that the declarant was pausing between statements because she was watching the ongoing confrontation between defendant and Morris, rather than because she was evaluating what to say next. Nothing in the call suggests, as defendant urges, that Maria "had thought about the incident and concluded that there might be a criminal prosecution." To the contrary, Maria requested paramedics, not police, at the outset of the call.

In sum, we conclude the trial court did not abuse its discretion in admitting the contents of Maria's 911 call as spontaneous statements under section 1240.[5]

C.      *Harmless Error*

Additionally, any error would have been harmless under either the state "reasonable probability" or the federal "beyond a reasonable doubt" standard of prejudice. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson* (1956) 46

---

[5] For the same reasons, we reject defendant's argument that the admission of the call violated her due process rights. (See *People v. Partida* (2005) 37 Cal.4th 428, 439 ["[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial fundamentally unfair. [Citations.]"].)

Cal.2d 818, 836.) The evidence of defendant's assault was compelling. Defendant herself admitted at trial that she hit Morris with the cane, but claimed it was self-defense because Morris swung at her first. However, the other eyewitness, Almanza, testified that she saw defendant advance toward Morris from several feet away with the cane in her hand and then hit Morris on the head. The only evidence that Morris struck first was defendant's own testimony, and even defendant's version of events changed over time. Further, the blood on the cane and on the ground and Morris's initial statements to police immediately following the incident (before he had the chance to reflect on the consequences to defendant) are consistent with defendant striking Morris, rather than with Morris falling or a mutual physical fight.

Defendant also argues that the redacted statements on the 911 call were insufficiently blacked out, such that the jury would have been able to read the statements on the transcript. Defendant states that she is not raising this issue as a separate claim of error, but that it "contributed to the 911 call's prejudicial effect" by "encourag[ing] the jury to believe that [defendant] was the aggressor." Even assuming the jury ignored the clear intent of the redaction and considered these statements, we remain persuaded that the error was harmless beyond a reasonable doubt. As discussed above, the evidence was strong in support of the conclusion that defendant was the sole aggressor. Indeed, the prosecution highlighted the *other* eyewitness, Almanza, repeatedly during closing argument, stating that Almanza was the "most credible witness in the case," and noting that Almanza's unobstructed view of defendant prior to the assault conclusively rebutted defendant's self-defense claim. As such, defendant would not have received a more favorable outcome absent admission of the 911 call.

## II.    Presentence Credits

Defendant contends she is entitled to two additional days of presentence custody credit. The Attorney General concedes the error. Defendant was awarded 246 days of credit for actual custody, plus 36 days of conduct credit, for a total of 282 days. We agree that the correct amount of credit should be 247 actual days, reflecting defendant's

time in custody from July 13, 2014 until and including sentencing on March 16, 2015, plus 37 days of conduct credit (Pen. Code § 2933.1, subds. (a), (c)), for a total of 284 days of credit.

## DISPOSITION

We remand this matter to the trial court with directions that it correct the abstract of judgment to reflect an award for 284 days of presentence custody credit. We direct the trial court to forward a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

COLLINS, J.

We concur:

WILLHITE, Acting P. J.

MANELLA, J.