Filed 9/8/16  P. v. Burns CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B264705 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA412395) |
| v. | |
| JEFFREY OLIN BURNS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of the County of Los Angeles, Jose I. Sandoval, Judge.  Affirmed.

Murray A. Rosenberg for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Michael R. Johnson, Supervising Deputy Attorney General and Marc C. Kohm, Deputy Attorney General, for Plaintiff and Respondent.

# INTRODUCTION

A jury found defendant and appellant Jeffrey Burns (defendant) guilty of, inter alia, four counts of forgery and one count of perjury based on a scheme he developed and in which he participated to fraudulently obtain government-subsidized childcare benefits from certain nonprofit childcare development programs. On appeal, he contends that the evidence in support of the verdicts on those five counts was insufficient.

We hold that the evidence in support of the five counts challenged on appeal was sufficient to support the guilty verdicts. We therefore affirm the judgment of conviction.

# FACTUAL BACKGROUND

## A. Overview[1]

Defendant was convicted on multiple counts involving fraudulent activity that he does not challenge on appeal. As to those counts, the jury found that defendant, while acting as the pastor of the Word Center church in Long Beach (the church), developed, directed, and participated in a scheme whereby members of his church and others fraudulently obtained government-subsidized childcare benefits from certain nonprofit childcare development programs, including a program called Crystal Stairs.

Pursuant to that scheme, members of the church, at defendant's direction and with his assistance, filled out and submitted to Crystal Stairs documents that falsely verified that they were employed by the church or an affiliated organization and in need of childcare during work hours. Other members of the church then submitted documents to Crystal Stairs that falsely represented that they were providing childcare for fellow church members and also verified false time records that purportedly documented the number of hours each week that those members spent providing such childcare. Crystal Stairs would then pay the members who verified the falsified time records according to the number of hours claimed, and those members would deposit the funds in bank

---

[1] The parties in their briefing do not dispute the facts in this overview.

2

accounts controlled by defendant who would then distribute portions of the fraudulently obtained childcare benefit payments to participants in the scheme.

Specifically, church members Arneisha Edwards, Jessica Bulahan, Giavonna Hunt, and Larisha Perkins admitted that they made false claims regarding their employment by the church or an affiliated organization and their need for child care to Crystal Stairs at defendant's direction and with his assistance. Each of those witnesses testified that defendant was directly involved in the preparation and submission of documents necessary to support their claims for childcare benefits. For example, Perkins testified that at the church she saw defendant print out falsified earnings statements for her on his laptop computer so she could submit them to Crystal Stairs. Hunt and Bulahan signed employer verification forms authorizing their purported employer, the church, to release employment information to Crystal Stairs. Those forms were returned to Crystal Stairs after the employer portion of the forms had purportedly been filled out by a church supervisor verifying a fabricated hourly pay rate and number of hours worked each week by Hunt and Bulahan. Hunt and Bulahan also submitted earnings statements from the church given to them by defendant showing the number of hours worked during the pay period covered by the statement, an $8.00 hourly pay rate, gross earnings, and withholdings and deductions, but each testified that she was not employed by the church. And the church never filed the required registration paperwork with the California Employment Development Department reporting that it had employees to whom it paid wages from which it deducted state income taxes.

### B. The Challenged Crimes

#### 1. Prosecution's Case

Although most of the fraud was committed against Crystal Stairs, the counts that defendant challenges on appeal involved another childcare development program called the Children's Home Society of California (Children's Home) and a church member and codefendant named Ebonique McKay. McKay, who pleaded guilty to grand theft, did not testify, but an employee of Children's Home, Michelle Bell, testified about documents

3

McKay submitted to that program, such as an application for childcare benefits, an employment verification form, earnings statements, and time sheets for childcare.

In an application for childcare benefits that McKay submitted to Children's Home, she represented under penalty of perjury that she was working eight hours a day, five days a week, that her family's income was $1,907.34 per month, and that her two children required 9.33 hours of childcare per work day. McKay's employment verification form, which authorized the church to release employment information to Children's Home was purportedly filled out and signed by her "supervisor" at the church, Andre Porter. The employer portion of that form represented that, beginning August 15, 2009, McKay was working at the church from 8:00 a.m. to 5:00 p.m. five days a week and being compensated $8.00 per hour. Bell confirmed that, once Children's Home received this document back from an employer, an employee of Children's Home would call the supervisor listed on the form to verify the parent's employment. McKay's form was initialed in a space at the bottom indicating that a Children's Home employee had contacted "Andre," a "financial officer" at the church, to verify McKay's employment.

According to Bell, Children's Home was a "subsidized childcare program . . . [that was required] to verify a parent's eligibility, and their eligibility [was] based on [the parent's] income, so [the parent had] to qualify by being [a member of] a low income family. And [Children's Home] verif[ied] that [the parent was working] through [the parent's] check stubs . . . ." Bell identified earnings statements submitted by McKay that were purportedly issued by the church. For example, the one dated September 25, 2009, showed that during the pay period covered by the statement, McKay worked 70 hours for the church at a pay rate of $8.00 per hour and earned $560, from which certain deductions were made.[2]

---

[2]     In an October 2009 quarterly report for cash aid and food stamps filed with the Department of Public Social Services, McKay represented that she had no income and did not expect a change in that status in the next three months.

Bell also identified an "attendance sheet" for March 2011 filled out by McKay and submitted to Children's Home purportedly showing the days and times McKay used childcare during the month. The childcare provider listed on the sheet was codefendant Lisa Corbin, who pleaded guilty prior to trial and did not testify. Children's Home used the document to calculate the reimbursement attributable to Corbin's services. According to a "voucher history detail by provider" that Bell provided to investigators, Children's Home paid a total of $13,556.71 for the childcare services Corbin purportedly provided to McKay's children.

Bulahan testified that she knew McKay and that McKay was a member of the church. Andre Porter, who purportedly signed McKay's verification of employment form and confirmed her employment by telephone, was also a member of the church[3] and he too knew McKay, presumably from her participation in church activities, but he did not know Corbin. According to Porter, there was no office work performed at the church and any paperwork that needed to be done was handled exclusively by defendant, who also handled all the money collected from members. Porter never signed any verification of employment forms from Crystal Stairs or any other organization and he never verified on behalf of the church anyone's employment by telephone. At some point, defendant and his wife decided to move to Arizona with some other members of the church. Porter and his wife did not want to move, so they stayed with the remaining members of the church. McKay and her husband, Terrell Ward, tried to keep the church in existence by holding services in their apartment.

### 2. Defense Case

Connie White was a member of the church and a trustee board member.[4] According to White, Hunt worked doing marketing for the church, but primarily from

---

[3]    Porter estimated that the church had at most approximately 20 members.

[4]    White estimated that the church had a membership of between 150 and 200 members.

home. Bulahan also worked for the church doing marketing. Porter was a trustee board member of the church who worked playing the drums and providing security at church services. White regarded Porter as a "pretty important individual insofar as running the church." She claimed McKay worked at the church as a cook.

Defendant testified that he discussed the childcare benefits available from programs like Crystal Stairs with church members who had children and he assisted members in preparing paperwork for such benefits. He also drove members to Crystal Stairs in the church van "all the time."

According to defendant, "everybody" deposited their checks in an account controlled by him, but he denied ever preparing any statements of earnings for any church member. Defendant maintained that Hunt, Bulahan, Porter, and other prosecution witnesses lied when they testified that they did not work for the church, as well as when they claimed that the documentation they submitted to obtain childcare benefits was provided to them by defendant.

Defendant asserted that McKay and her husband, Ward, were not only members of the church, but also members of its board. When McKay was not doing the cooking for the church, she would do administrative work and help out at the thrift store. Defendant claimed he had nothing to do with the childcare benefits that McKay received from Children's Home and that he did not know Corbin.

### PROCEDURAL BACKGROUND

In a 78-count amended information, defendant was charged with conspiracy to commit or aiding and abetting[5] the commission of grand theft of childcare funds, grand theft of personal property, forgery, perjury by declaration, and making a false statement. Prior to trial, the trial court dismissed counts 44, 46, 48, 49, 50, 52, 54, 56, 62, 65, 67, 69, and 71. At the prosecution's request, the trial court also dismissed count 78. Following a

---

[5] The trial court instructed the jury on conspiracy and aiding and abetting, and the prosecutor argued those theories during closing argument.

jury trial, the jury found defendant not guilty on counts 6 and 29, but guilty on the remaining counts.

The trial court sentenced defendant on count 77—perjury by declaration in violation of Penal Code section 118, subdivision (a)—to a high term sentence of four years, plus an additional two-year term pursuant to section 186.11, for an aggregate sentence of six years. The trial court stayed sentence on the remaining counts.

## DISCUSSION

### A.    Standard of Review

Our review of defendant's contention that there was insufficient evidence to support the guilty verdicts on the five counts involving McKay is governed by the substantial evidence standard. "When a defendant challenges the sufficiency of the evidence, '"[t]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.]' [Citations.] . . . 'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence. [Citation.]' [Citation.] We ""'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'" [Citation.]' [Citation.]" (*People v. Clark* (2011) 52 Cal.4th 856, 942-943.)

### B.    Legal Principles

Defendant was found guilty of, inter alia, conspiring to commit or aiding and abetting the commission of the five counts involving McKay that he challenges on appeal:  count 31—forgery regarding money earned by McKay between September and October 2009; count 33—forgery regarding money earned by McKay in November 2009; count 36—forgery regarding money earned by McKay in between January and November 2010; count 40—perjury committed in April 2010 regarding McKay working

7

at the church five days a week; and count 41—forgery regarding McKay's employment in April 2010.  According to defendant, although McKay pleaded guilty to committing grand theft from Children's Home, there was no evidence linking him to any fraudulent activity by McKay and Corbin.

### 1.    Conspiracy

The law of conspiracy serves dual purposes in the criminal arena.  It is a substantive crime that, if charged, is punishable according to the crime the defendant conspired to commit.  It also serves as a basis for vicarious liability even though the crime of conspiracy is not charged as a separate offense.  "[C]onspiracy is not only a crime in California, it is also a theory of vicarious criminal liability.  Thus, members of a conspiracy are criminally responsible not only for the target crime, if it is committed, and the crime of conspiracy but also for any crimes that are the natural and probable consequences of the execution of the conspiracy." (*People v. Zacarias* (2007) 157 Cal.App.4th 652, 660.)  "It is long and firmly established that an uncharged conspiracy may properly be used to prove criminal liability for acts of a coconspirator.  (*People v. Lopez* (1963) 60 Cal.2d 223, 250 [32 Cal.Rptr. 424, 384 P.2d 16] [uncharged conspiracy to commit burglaries admissible to prove identity of murderer]; *People v*. *Pike* (1962) 58 Cal.2d 70, 88 [22 Cal.Rptr. 664, 372 P.2d 656] [uncharged conspiracy to commit robberies admissible to prove armed robbery culminating in murder].)  'Failure to charge conspiracy as a separate offense does not preclude the People from proving that those substantive offenses which are charged were committed in furtherance of a criminal conspiracy [citation]; nor, it follows, does it preclude the giving of jury instructions based on a conspiracy theory. (*People v. Washington* (1969) 71 Cal.2d 1170, 1174 [81 Cal.Rptr. 5, 459 P.2d 259, 39 A.L.R.3d 541]; *People v. Ditson* (1962) 57 Cal.2d 415, 447 [20 Cal.Rptr. 165, 369 P.2d 714]).' (*People v. Remiro* (1979) 89 Cal.App.3d 809, 842 [153 Cal.Rptr. 89, 2 A.L.R.4th 1135].)" (*People v. Belmontes (*1988) 45 Cal.3d 744, 788-789.)

8

"'A conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act "by one or more of the parties to such agreement" in furtherance of the conspiracy' " (*People v. Morante* (1999) 20 Cal.4th 403, 416 [84 Cal.Rptr.2d 665, 975 P.2d 1071], quoting Pen. Code, § 184.) . . . Other than the agreement, the only act required is an overt act by *any* of the conspirators, not necessarily the defendant, and that overt act need not itself be criminal. (*People v. Russo* (2001) 25 Cal.4th 1124, 1135 [108 Cal.Rptr.2d 436, 25 P.3d 641].)" (*People v. Smith* (2014) 60 Cal.4th 603, 616.)

"'Although the existence of the conspiracy must be shown by independent proof [citation], the showing need only be prima facie evidence of the conspiracy. [Citation.] The prima facie showing may be circumstantial [citation], and may be by means of any competent evidence which tends to show that a conspiracy existed. [Citation.]' (*People v. Jourdain* [(1980)] 111 Cal.App.3d [396,] 405.) Furthermore, the independent proof required to establish the existence of a conspiracy may consist of uncorroborated accomplice testimony. (*People v. Price* (1991) 1 Cal.4th 324, 444 [3 Cal.Rptr.2d 106, 821 P.2d 610]; *People v. Cooks* (1983) 141 Cal.App.3d 224, 312 [190 Cal.Rptr. 211].) [¶] . . . [¶] Evidence is sufficient to prove a conspiracy to commit a crime 'if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime. [Citation.] The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy. [Citations.]' (*People v. Cooks*, *supra*, 141 Cal.App.3d at p. 311.)" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1134-1135.)

### 2. *Aiding and Abetting*

"'A "person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime."'" (*People*

*v. Marshall* (1997) 15 Cal.4th 1, 40 [61 Cal.Rptr.2d 84, 931 P.2d 262].) . . . [¶] 'Whether a person has aided and abetted in the commission of a crime ordinarily is a question of fact. . . . [¶] . . . [¶] Among the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense.' (*In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1094 [126 Cal.Rptr. 898], citations omitted.) . . . 'Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction.' (*People v. Bloom* (1989) 48 Cal.3d 1194, 1208 [259 Cal.Rptr. 669, 774 P.2d 698].)" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054-1055.)

### C. Analysis

Under the controlling standard of review—i.e., in the light most favorable to the verdicts, presuming in support of the judgment every fact the jury could reasonably deduce from the evidence—the evidence supporting the five challenged counts was sufficient to support a reasonable inference of defendant's guilt beyond a reasonable doubt. It was undisputed that McKay, who pleaded guilty to grand theft of childcare benefits directed at Children's Home, was a member of the church during the relevant time period, when defendant was its pastor and directed a similar scheme targeting Crystal Stairs. Porter testified that the church had 20 or fewer members, several of whom admitted to being involved in defendant's scheme to fraudulently obtain childcare benefits from Crystal Stairs. Defendant admitted that he advised church members with children about the childcare benefits available from organizations such as Crystal Stairs, assisted members in filling out the required paper work to obtain such benefits, and even drove members to Crystal Stairs to expedite the process for obtaining benefits. Moreover, the jury found that defendant directed and participated in the scheme involving, inter alia, church members Edwards, Bulahan, Hunt and Perkins, each of whom submitted false documentation to Crystal Stairs provided to them by defendant, including false earnings statements. In these circumstances, the jury could have drawn an

10

inference that the Children's Home scheme could not have occurred at the church absent defendant's participation.

Although defendant denied any involvement in McKay's application for benefits from Children's Home, the jury obviously did not find that testimony credible and, indeed, could have drawn inferences against defendant after evaluating his testimony. In addition, certain of the documents that other members, like Hunt and Bulahan, submitted to obtain benefits and which they testified defendant provided to them, were substantially similar to documents that McKay provided to Children's Home. For example, Hunt and Bulahan submitted employment verification forms that contained information substantially similar to the information that was included in the form submitted by McKay, including that each member was paid at a rate of $8.00 per hour, each worked either 7 or 8 hours a day, Monday through Friday, and, as to Hunt and McKay, each form was signed by Porter who purportedly thereafter verified their employment by telephone. Similarly, the earnings statements submitted by Hunt and Bulahan to Crystal Stairs were virtually identical to the ones submitted by McKay to Children's Home, including that each statement showed that the member worked 70 hours during the period covered by the statement and each member was paid at a rate of $8.00 per hour for a total of $560 in gross income. Bulahan and Hunt testified that defendant had provided the earnings statements that they submitted to Crystal Stairs, and Perkins testified that at the church she saw defendant print out earnings statements for her on his laptop. That paperwork and testimony supported a reasonable inference that McKay received the same assistance with her paperwork from defendant that Hunt, Bulahan, and others had received from him.

In addition, McKay, a church member, submitted to Children's Home forms and information that she would have known would be provided to defendant or someone acting on his behalf, including the employment verification form authorizing the church to release employment information and earnings statements. Such forms required the church to act, including filling out the employer's portion of the verification form and confirming by telephone the hours and wage information on each earnings statement.

11

Porter testified that defendant handled all the church's paperwork, suggesting that the church had no other employees who performed that task, and Porter also testified that he did not sign any employment forms or verify any member's employment by telephone. Given that testimony, which the jury presumably credited, the jury could have concluded that McKay could not have executed the fraud scheme involving Children's Home absent defendant's participation.

Defendant contends that the jury's not guilty verdict on count 6—the grand theft of the $13,556.71 that Children's Home paid in benefits for Corbin's time purportedly spent caring for McKay's children—was inconsistent with the verdicts on the challenged counts and supported the conclusion that the evidence in support of the challenged counts was as insufficient as the evidence in support of count 6. But the evidence concerning defendant's involvement with the documents submitted by Corbin was different than the evidence relating to the documents submitted by McKay. For example, there was no evidence that Corbin was a church member or that defendant otherwise knew her or was associated with her. Similarly, although Porter knew McKay and the other church members involved in defendant's scheme, he did not know Corbin. The jury therefore could have reasonably concluded that defendant may not have been directly involved with the paperwork submitted by Corbin and gave defendant the benefit of the doubt as to that count. In any event, an inconsistent verdict is not grounds for reversing a judgment based on insufficient evidence. (*People v. Lewis* (2001) 25 Cal.4th 610, 656 ["It is well settled that, as a general rule, inherently inconsistent verdicts are allowed to stand"].)

**DISPOSITION**

The judgment of conviction is affirmed.


RAPHAEL, J.*


We concur:



TURNER, P.J.



BAKER, J.

---

\*      Judge of the Superior Court of the County of Los Angeles, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.