Filed 11/24/20  P. v. Lopez CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B297094 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. PA089086) |
| v. | |
| HECTOR LOPEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael Terrell, Judge.  Affirmed.

Robert E. Boyce, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, David E. Madeo and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

Hector Lopez was charged with first degree murder for the death of Michelle Malander. The information further alleged he personally used a deadly and dangerous weapon in the killing. The jury convicted Lopez of second degree murder and found the deadly and dangerous weapon use allegation to be true.

Because this case involved domestic violence, Evidence Code[1] section 1109 permitted the prosecution to introduce evidence of Lopez's prior acts of domestic violence against Malander (her hearsay statements involving Lopez's abuse but we hold that they weren't admissible), and evidence of her injuries in order to prove his propensity to commit the charged offense.

On appeal, Lopez argues the trial court prejudicially abused its discretion by admitting evidence of the following: Malander's hearsay statements involving Lopez's abuse; photos of her injuries; and uncharged prior acts of domestic violence. Lopez also argues the trial court erred by refusing defense counsel's request for a jury instruction on the lesser-included offense of involuntary manslaughter. We affirm.

The trial court did not abuse its discretion by admitting evidence of prior acts of domestic violence and evidence of Malander's injuries. The evidence was relevant and not unduly prejudicial. The trial court also did not err by refusing to instruct on the lesser included offense of involuntary manslaughter. However, the trial court did err by admitting Malander's hearsay statements, but the error was harmless.

---

[1] Subsequent undesignated statutory citations are to the Evidence Code.

# BACKGROUND AND PROCEDURAL HISTORY

## A.     Factual Background

Lopez and Malander lived in a motorhome behind a house rented by Maribel Gamez.  Gamez rented her home from Lopez's uncle.  After an extensive history of domestic violence, spanning more than a decade, Lopez killed Malander one evening in this motorhome by the use of a sharp instrument inflicting a fatal puncture wound to her skull.

### 1.     *Domestic Violence Incident Observed Two Months Prior to the Murder*

Gamez testified she witnessed the following about two months prior to Malander's murder.  Gamez heard a noise and when she looked out of her window she saw Malander running.  Lopez caught up to Malander, pulled her hair, and kicked her.  Gamez approached the couple and told them to calm down— Gamez's children were watching.  Gamez saw no injuries on Lopez, but noticed Malander was bleeding from her nose and mouth.  Gamez asked Malander if she should call the police, but Malander said, "No," explaining she was afraid Lopez would retaliate and hurt her even more.  So Gamez washed Malander's face and offered to let her stay the evening in her home.  Malander again refused, explaining that Lopez would retaliate if she was seen speaking to other people.  When Gamez asked Lopez about the incident, Lopez said it was Malander's fault that he hit her.

### 2.     *The Murder*

The murder occurred late in the evening on June 22, 2017, or in the early morning on June 23.  Gamez was at home and heard a woman screaming.  When she went outside to throw out the trash, Lopez asked to borrow her cell phone to call the police.  He said "his wife had drank and had passed out."  Gamez gave Lopez her cell

3

phone, Lopez dialed and spoke, but Gamez did not hear the conversation.  Lopez then returned the cell phone and left.

Lopez came back to speak with Gamez a second time, and again explained he needed her phone to call "an ambulance." Gamez responded that Lopez already called them, but Lopez said: "Dial again because it's an emergency."  Gamez gave Lopez her phone, Lopez dialed again, but Gamez did not hear Lopez speak to the operator.

Lopez left and returned a third time, again asking Gamez to call 911.  Gamez gave her phone to her 12-year-old son and asked him to call 911.  She thought Lopez was frightened.

Gamez's son did not know how to dial correctly, handed Gamez the phone, and the operator told Gamez that the previous caller "was not giving the address."  Gamez gave the operator the address and the operator asked her to check to see if Malander was breathing.  Gamez went to the motorhome, still holding her phone, and Lopez took the phone away from her when Gamez lifted the curtain inside the motorhome to check on Malander.  She saw Malander sitting in a chair with her eyes open, not breathing, and bleeding from her left temple.

Gamez heard Lopez say to Malander, "Mamacita, I love you and I will not do this to you again."  Gamez and Lopez exited the motorhome and Lopez ran toward the ambulance.

Gamez called Lopez's mother, Meztli Papalotl.  When Papalotl arrived, paramedics were at the scene.  When Papalotl asked Lopez what happened, he said Malander fell in the trailer; he did not say anything about Malander hitting her head.

Around 12:30 a.m., Lopez drove to Lucille Malander's house, who was Malander's mother.[2]  He shook her awake and said, "Get up.  Get up.  It's Michelle and this time it's really bad."  Lucille exited her home and joined Papalotl in a vehicle waiting outside, and they drove to a nearby hospital.

Nothing was said in the car ride to the hospital.  When Lucille asked Lopez what happened to her daughter, Lopez did not answer.  Lucille never saw Lopez cry, nor did she ever get an explanation from him as to why her daughter died.

Rachael Johnson, Malander's sister, arrived at the hospital.  When Johnson asked Lopez what happened, Lopez told her, "I didn't do anything to her.  I wouldn't do anything.  I love her."  Johnson testified that Lopez appeared nervous, but not crying.  Lopez told Johnson that he and Malander had been drinking, that Malander could not control how much she drank, and that she fell accidentally.

Police arrived at the hospital a few hours later, around 3:40 a.m.  Officer Sergio Moreno spoke with Lopez.  Lopez said that he and Malander were "drinking margaritas [outside] because it was a hot night."  Lopez at first said that when they were done drinking, Malander walked into the motorhome first, but then stated, "No, no, no.  Wait.  I walked in first."  And after he walked in first, Malander fell backwards and hit her head.  Lopez was not sure whether she hit her head on the ground or on the building beside the motorhome.  Lopez said Malander then immediately fell unconscious.  Lopez added he then called 911 and administered CPR until the ambulance arrived.

---

[2] Since the mother and the victim share the same last name, we refer to the mother by her first name for ease of reading.

Officer Moreno testified Lopez appeared nervous and avoided eye contact. Lopez repeatedly insisted he had never drunk alcohol before that evening, and that he only drank that evening because it was hot.

Lopez was arrested at the hospital.

3. *The Investigation*

Detective Gabriel Bucknell responded to the crime scene later that morning around 9:00 a.m. He observed the inside of the motorhome was cluttered and showed signs of a struggle. He saw a shattered mirror, and the pieces of the mirror were on the floor and even outside the motorhome. He also saw a broken remote control. Trace amounts of blood were on the floor and clothing was strewn about. Outside the motorhome, he noticed a table was set up with some tools. A screwdriver was among the tools, but it was not bloody and did not appear out of place. A hammer was lying on the ground next to the table.

Dr. Timothy Dutra, a deputy medical examiner, performed the autopsy. He determined Malander died of a penetrating stab wound to the side of her head: the wound was about two inches deep. Dr. Dutra opined the fatal stab was caused by a screwdriver. He testified the stab wound could not have been caused by falling to the ground, or falling and hitting the corner of a countertop or cabinet.

On cross-examination, Dr. Dutra testified it was "possible" that the stab wound could have been caused by falling on a nail sticking out of the wall or the floor. But after Dr. Dutra was shown several photographs of the crime scene, he could find nothing in those pictures that could account for the particular kind of wound that was inflicted to Malander's head. Nor did anyone else testify there was a protruding object at the scene of the murder that could have caused the wound.

Malander had bruises and abrasions all over her body. Dr. Dutra testified that these bruises had been recently inflicted. Traces of alcohol and THC were found in Malander's system.

## B. Charges, Trial, and Sentencing

### 1. *Charges*

A single-count information charged Lopez with murder in the first degree. (Pen. Code, § 187, subd. (a).) The information further alleged Lopez personally used a deadly and dangerous weapon. (*Id.*, § 12022, subd. (b)(1).)

### 2. *Evidence of Prior Acts of Domestic Violence and the Trial Court's Rulings*

The prosecutor filed a trial brief in which she advised the trial court she was seeking to introduce evidence of Lopez's prior acts of domestic violence against Malander. One of the occurrences was a May 17, 2008 incident which was reported to the police. The prosecutor also sought to introduce evidence from several witnesses who would testify that they saw injuries on Malander, along with Malander's statements that Lopez inflicted the injuries.

The prosecutor argued that the prior acts of domestic violence were relevant to explain Malander's conduct, to prove her state of mind (that she was afraid of Lopez), to prove Lopez's motive to kill, and to rebut any assertion that Malander's killing was an accident. The prosecutor asserted that Malander's hearsay statements were admissible under sections 1250, subdivision (a) (declarant's then-existing state of mind, emotion or physical sensation offered to prove or explain declarant's conduct where it was at issue), 1251 (similar provision), and 1252 (hearsay statement inadmissible if made under circumstances indicating lack of trustworthiness). The prosecutor also asserted Malander's statements were admissible nonhearsay offered as circumstantial evidence of the declarant's state of mind and the state of mind of the listener.

In a section 402 pretrial hearing, the trial court, defense counsel, and prosecutor discussed the prior acts and hearsay evidence. We now review this evidence and indicate the trial court's rulings.

### a. Zonia Sermeno

#### i. *Statements*

Zonia Sermeno knew Malander since they were children. She said Malander was her best friend. They were also coworkers at an emergency medical call center from 2013 to 2017.

Malander told Sermeno that Lopez was an abusive person. Sermeno would see Malander come to work, "three, four times out of the week . . . [a]nd during the day, four, five times [Sermeno] would catch [Malander] crying."

About a year before Malander was murdered, she showed up to work and told Sermeno she "got to show you something." Malander took Sermeno into the bathroom, took off her pants, and Sermeno "saw bruising in between [Malander's] thighs." Malander said Lopez held her down and raped her.

On another incident, Malander called Sermeno on a Friday night and asked if Sermeno would come with her to the emergency room. Sermeno said of course she would. Malander said: "He just broke my wrist. Can you go with me?" Malander added: "Let me see if he falls asleep. I can't—I can't leave." Sermeno never heard back from Malander, and later the next day Malander appeared at work with her bone "sticking out of her wrist."

Sermeno told Malander multiple times that she should leave Lopez. Malander explained that she could not, because she was afraid he would kill her and afraid that she would never see her son again—Lopez's mother had custody of their son. Malander told Sermeno to tell no one about the abuse.

Malander told Sermeno that she had to leave work on time or she would get in trouble with Lopez. Malander had to check in with Lopez every 15 to 20 minutes. At times, Lopez made Malander leave work early.

ii.    *Objections and Ruling*

Lopez's counsel objected to the admission of Malander's hearsay statements to coworkers and family members, asserting they did not fall within the hearsay exceptions identified by the prosecutor, and were also inadmissible under section 352 because some of the statements were prejudicial and irrelevant.

Lopez's counsel argued that Sermeno's testimony about Malander's statements that Lopez held her down and raped her were inadmissible under section 352. Counsel further argued that the rape was inflammatory and the jury's focus would turn from the facts of the case to the asserted rape.

Lopez's counsel also argued that Malander's statements that Lopez made her "check in" with him multiple times a day constituted multiple levels of hearsay without an appropriate exception and was inadmissible under section 352.

The prosecutor responded that the rape was relevant to show that Lopez exerted control over Malander, and that the rape and her visible injuries showed she was in fear of him. The prosecutor argued that Malander's statements about checking in with Lopez were admissible to show Lopez's motive and her fear. The prosecutor argued Malander's fear and mental state were at issue because Lopez had told multiple persons that the killing was an accident. The statements about checking in were also relevant to explain Malander's conduct.

The trial court overruled counsel's objections to Sermeno's testimony.

### b. Rachael Johnson

#### i. *Statements/Documents*

Johnson also worked at the emergency medical call center. She testified that Lopez and Malander started dating when Malander was about 16 years old. Sometime within the first two years of that relationship, Johnson saw Lopez pull Malander's hair and slap her.

Johnson also saw Malander's broken wrist, testifying: "She had a bone popping out here, and she kept saying she had to go get it looked at. She never went to get it looked at, so it stayed that way."

About six months prior to her murder, Malander told Johnson that Lopez had an affair with another woman but Malander was afraid to leave him. Johnson discovered evidence of the affair on Lopez's Facebook page. Malander also told Johnson that Lopez had raped her.

The trial court admitted three notes from Lopez to Malander that Johnson had found in the motorhome after Malander's death. In one card dated February 15, 2008, Lopez wrote "em [*sic*] sitting here in the car crying thinking about how bad I hurted you." The card concludes with the promise, "I'm gonna perfect my-self and check my-self in not hitting you no more." In a letter, Lopez wrote, "this time I learn the true meaning of not touching u in . . . any hitting way." In another card, Lopez wrote, "There is no reason to hit a woman especially if she didn't do anything to hurt you!!" "I will come to you and say sorry, but if you speak I will hit you," and "I hit Michelle just because I think she is stupid compared to me."

#### ii. *Objections and Ruling*

Lopez's counsel objected on "[section] 352 grounds, multiple hearsay grounds" to Johnson's testimony about Malander's statements to Johnson and Johnson's observations on Facebook

confirming Lopez's affair. The trial court ruled that Malander's statements that she confronted Lopez about an affair was admissible.

### c. Lucille Malander

#### i. *Statements*

Lucille was the office manager at the emergency medical call center where Malander worked. Lucille testified that Malander and Lopez started dating when Malander was 16 years old and had a son together about a year and a half later. Lopez's mother, Papalotl, took custody of the boy when he was about nine months old due to domestic violence in the Malander-Lopez household.

Lucille saw injuries on Malander on two occasions. Once, she saw Malander with a missing front tooth. Malander initially claimed that she knocked out her tooth from tripping, then later said Lopez had knocked her tooth out. Another time, Michelle saw Lopez strike Malander with nunchucks.

When Lucille told her daughter to leave Lopez, Malander said if she tried, Lopez "would kill her whole family."

Lucille also testified that Malander would often call in sick to work, and she knew the reason was that there had been violence between Malander and Lopez.

#### ii. *Objections and Ruling*

Lopez's counsel objected to the testimony of any witnesses speculating that Malander called in sick to work because Lopez had beaten her. Counsel also objected to Lucille testifying about "all sorts of hearsay stories about things that may have happened or didn't happen."

The trial court ruled that Lucille's testimony could not be "just a generalized he's always hitting her," but had to be about specific incidents.

### d.    Yessica Garcia/Meztli Papalotl

#### i.    *Statements*

Yessica Garcia knew Malander since they were children. Garcia testified that Malander was around 17 years old when she started dating Lopez. On two or three occasions, Malander told her that Lopez was very abusive and would hit her. The second time that Malander told Garcia about the abuse, Garcia went to look for Lopez because she wanted to beat him up. Malander followed Garcia and told her to let it be. Garcia could not find Lopez. The third time, Garcia saw a bruise on Malander's left wrist. Garcia tried to lift up Malander's sleeve, but Malander pulled away. Garcia stopped talking to Malander; Garcia told her "I can't hear this and you're not doing anything to leave him." Garcia was afraid for Malander's safety.

Papalotl testified that she took custody of Lopez's and Malander's son when he was about a year old because they constantly argued and were homeless. Papalotl did not see physical violence between the two of them. Papalotl told Malander to leave Lopez if he was not good to her. Malander responded that she knew how to handle Lopez. Papalotl told the police that Lopez and Malander had a violent relationship. Lopez became aggressive when he drank.

Garcia offered a different account of why Papalotl took custody of the boy. She would testify that Lopez was so jealous of the child that he did not permit Malander to breastfeed her son.

#### ii.    *Objections and Ruling*

Lopez's counsel objected on hearsay, relevance and section 352 grounds to Garcia's testimony recounting Malander's statements of why Malander gave up her baby.

The trial court ruled that "[t]he fact that the baby was given up because of domestic violence" was relevant and admissible. The

court also ruled that evidence that Lopez was jealous of the baby as relevant to prove the state of mind of both Lopez and Malander if supported by adequate foundation, but that any details, such as Lopez becoming jealous when Malander was breastfeeding, were inadmissible under section 352. This ruling also applied to Papalotl's testimony to the same facts.

### e. May 17, 2008 Arrest

Detective Glenn Jackson testified that on May 17, 2008, he responded to a 911 call involving a domestic violence incident in a Rite-Aid parking lot. Malander told the detective that she and Lopez had gotten into an argument inside their van about his drinking. Malander had told Lopez to sober up because they were going to her parent's home to visit their child. Lopez became upset, told Malander "you can't tell me what to do," and pinned her to the floor of the van. Detective Jackson could not locate Lopez at the scene. Detective Jackson noticed bruising on Malander's right arm. She said that Lopez had hit her 20 times in the past. Lopez was later arrested for this incident, but the arrest did not result in a conviction.

Lopez' counsel objected to the officer's testimony describing the May 2008 domestic violence incident, arguing that it was too long in the past to be probative, having taken place 10 years prior to the charged murder. The prosecutor responded that she intended to only present the testimony of the arresting officer, who would testify as to Malander's spontaneous statements. The prosecutor further argued the incident was crucial because it was the only report that Malander made to the police, and multiple witnesses would testify that Malander never made any additional reports because Lopez had threatened to kill her.

The trial court ruled the incident was admissible because section 1109 was "designed for this purpose."

### 3. *The Trial Court's General Limiting Instruction*

The trial court instructed the jury with CALCRIM No. 303 as follows: "During the trial, certain evidence was admitted for a limited purpose. Specifically, Maribel Gamez, Rachael Johnson, Lucille Malander, Zonia Ser[meno] and Yessica Garcia all testified about statements the victim Michelle Malander made to them concerning domestic violence. You may consider those statements by the victim only as evidence of the victim's then existing state of mind, emotion or physical sensation, and for no other purpose."

### 4. *Defense Evidence*

Lopez did not present any affirmative evidence on his behalf.

### 5. *Conviction and Sentencing*

Lopez was found guilty of second degree murder, and the jury found the personal deadly and dangerous weapon use allegation true. The court sentenced Lopez to a total state prison term of 16 years to life. Lopez timely appealed.

## DISCUSSION

## A. Standard of Review

A trial court's rulings on the admissibility of evidence—including hearsay, the admissibility of prior acts of domestic violence, and section 352 determinations—are reviewed for abuse of discretion. (See *People v. Waidla* (2000) 22 Cal.4th 690, 725 [abuse of discretion standard applies to any evidentiary ruling, including hearsay]; *People v. Yates* (2018) 25 Cal.App.5th 474, 484-485 [hearsay rulings]; *People v. Poplar* (1999) 70 Cal.App.4th 1129, 1138 [§ 1109 evidence].)

Appellate courts review a trial court's failure to give a lesser included offense instruction under a de novo standard, considering the evidence in the light most favorable to the defendant. (*People v. Brothers* (2015) 236 Cal.App.4th 24, 30.)

14

We reverse a conviction only if the alleged error was prejudicial.  (See Cal. Const., Art. VI, § 13).  We review evidentiary errors for prejudice under the *Watson* test.[3]  We reverse if " 'after an examination of the entire cause, including the evidence,' [we are] of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."  (*Watson*, *supra*, 46 Cal.2d at p. 836.)

**B.      The Trial Court Did Not Abuse its Discretion by Admitting Evidence of Past Domestic Violence and Malander's Injuries**

1.      *Applicable Law*

Generally, evidence of propensity or disposition is inadmissible to prove a person's conduct on a specific occasion. (§ 1101, subd. (a); *People v. Villatoro* (2012) 54 Cal.4th 1152, 1159.) The Legislature, however, has created a specific exception to this general rule when the propensity evidence is domestic violence. (*Villatoro*, *supra*, at p. 1159.)

Section 1109, subdivision (a)(1), provides, in relevant part: "[I]n a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the  defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352."

Section 1109 allows for the admission of evidence of domestic violence perpetrated by the defendant even when the charged offense is murder.  (See *People v. Mitchell* (2020) 46 Cal.App.5th 919, 929 ["courts have unambiguously rejected the suggestion that [§ 1109] may only be applied when a domestic violence offense is

---

[3] *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*).

15

charged"]; *People v. Brown* (2011) 192 Cal.App.4th 1222, 1234-1237 [§ 1109 applied where defendant charged with murder].)

2. *The Trial Court Properly Admitted Evidence of Prior Acts of Domestic Violence*

Lopez argues that the trial court abused its discretion by admitting evidence of Malander's injuries because there was no evidence, other than her inadmissible hearsay statements, to prove that he was the one who inflicted the injuries.

While we agree with Lopez that Malander's statements attributing the source of her visible injuries to Lopez are hearsay statements requiring a valid exception or nonhearsay purpose, we disagree Malander's hearsay statements were the only evidence showing Lopez was the one who was harming Malander.

Lopez himself made admissions he had abused Malander. He wrote three cards or letters to Malander in which he admitted that he hit her.

There was also percipient witness testimony of Lopez committing acts of violence against Malander. Multiple witnesses personally observed Lopez commit acts of violence against Malander about two months prior to the killing. Gamez saw Lopez pull Malander's hair and kick her, and saw her bleeding from her nose and mouth. Johnson saw Lopez pull Malander's hair and slap her. Lucille saw Lopez hit Malander with nunchucks.

Because other admissible evidence overwhelmingly showed that Lopez beat Malander, there is no reasonable possibility that if those statements were omitted the result of the trial would have been different. Lopez therefore cannot demonstrate he was prejudiced by admission of Malander's hearsay statements attributing her injuries to Lopez.

16

3. *Admission of the Uncharged Acts of Domestic Violence Was Not Unduly Prejudicial Under Section 352*

Lopez asserts that the prior acts evidence was inadmissible under section 352 because it was highly prejudicial, had little probative value, was inflammatory, and confused the issues. We disagree.

Section 352 affords the trial court discretion to exclude evidence if its probative value is "substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352.)

Lopez's acts of domestic violence, offered to prove his propensity to commit such acts, was highly probative to show that Malander's killing was not an accident. (See *People v. Wang* (2020) 46 Cal.App.5th 1055, 1075 [rationale for permitting domestic violence propensity evidence under § 1109 is to eliminate any presumption that the isolated offense was an accident, isolated incident, or fabrication].) As for inflammatory, it was no more inflammatory than the circumstances of the murder itself: killing Malander by inserting a sharp object into her head.

There was also little possibility of confusing the issues. The jury was instructed with CALCRIM No. 852A regarding the purposes for which they could consider the prior uncharged acts of domestic violence.[4] Given the high probative value of the

---

[4] The instruction read in pertinent part: "The People presented evidence that the defendant committed domestic violence that was not charged in this case, specifically, conduct or acts occurring prior to June 22, 2017.

17

uncharged acts of domestic violence to Lopez's defense of accident, the trial court acted within its discretion in concluding that the probative value of the evidence of domestic violence was not substantially outweighed by the risk of undue prejudice, nor that it was likely to confuse the issues.

---

"Domestic violence means abuse committed against an adult who is his cohabitant.

"Abuse means intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable fear of imminent serious bodily injury to himself or herself or to someone else.  [¶] . . .

"You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged domestic violence.  Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt.  A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

"If the People have not met this burden of proof, you must disregard this evidence entirely.

"If you decide that the defendant committed the uncharged domestic violence, you may consider that evidence and weigh it together with all the other evidence received during the trial to help you determine whether the defendant committed murder. Remember, however, that evidence of uncharged domestic violence is not sufficient alone to find the defendant guilty of murder. The People must still prove each charge and allegation of murder beyond a reasonable doubt.

"Do not consider this evidence for any other purpose."

**C. The Trial Court Erred by Admitting Malander's Hearsay Statements, But the Error Was Harmless**

1. *Applicable Law*

If hearsay evidence is admissible, it may be introduced to prove prior acts of domestic violence offered under section 1109. (See *People v. Price* (2004) 120 Cal.App.4th 224, 240-241 [finding victim's hearsay statements offered to prove defendant's prior acts of domestic violence were admissible].)

Section 1250 provides: "(a) Subject to Section 1252,[5] evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant. [¶] (b) This section does not make admissible evidence of a statement of memory or belief to prove the fact remembered or believed."

"Our cases repeatedly have held that under . . . section 1250, a victim's out-of-court statements expressing fear of a defendant are relevant *only when the victim's conduct in conformity with that fear is in dispute.* [Citations.] We have upheld the admission of such evidence under . . . section 1250 when the victim's fearful state of mind rebutted the defendant's claims that the victim's death was

_____

[5] Section 1252 provides that a hearsay statement is inadmissible if made under circumstances indicating lack of trustworthiness. Lopez does not assert that any of Malander's hearsay statements were inadmissible under this statute; rather his only assertion is that her state of mind was not at issue.

accidental [citation], or provoked . . . ." (*People v. Riccardi* (2012) 54 Cal.4th 758, 816, fn. omitted, italics added.)

> 2.    *The Trial Court Incorrectly Admitted Malander's*
> *Hearsay Statements*

The general rule is that an out-of-court statement offered for the truth of the matter asserted is inadmissible hearsay unless the statement falls under an appropriate exception.  (See § 1200.)

Malander's statements to witnesses that (i) Lopez beat her; (ii) he was the source of her visible injuries, and (iii) he raped her, are all hearsay statements requiring an exception to the hearsay rule or a valid nonhearsay purpose to be properly admitted into evidence.

The Attorney General argues that Malander's statements were properly admitted for the nonhearsay purpose of establishing Malander's state of mind.  Lopez agrees that state of mind evidence is admissible where relevant, but argues that it was not relevant here.  More specifically the Attorney General contends that Lopez placed Malander's state of mind in issue himself by telling witnesses that Malander's death was accidental, and telling Gamez that Malander was the aggressor in an earlier fight.  The Attorney General cites *People v. Hernandez* (2003) 30 Cal.4th 835, 872-873, disapproved on another ground in *People v. Riccardi*, *supra*, 54 Cal.4th at p. 824, fn. 32,  for the rule that a murder victim's fear may be at issue when the defendant claims the victim behaved in manner inconsistent with that fear.  The Attorney General also cites *People v. Garcia* (1986) 178 Cal.App.3d 814, 822, for the rule that where the defendant claims self-defense or that a killing was accidental, statements by the victim showing fear of the defendant may be admitted to show the victim would not likely have been the aggressor.

We do not find the Attorney General's argument persuasive. In *Garcia*, the witness had called the victim who was at the defendant's house. The victim answered the phone and asked the witness to come pick him up stating the defendant had "gone crazy and he's going to shoot me." (*People v. Garcia, supra*, 178 Cal.App.3d at p. 818.) The victim asked the witness to bring a gun with her. After some angry yelling, the phone went dead. (*Id*. at p. 819.) At his trial for murder, the defendant admitted involvement in the victim's death, but claimed it was an accident. (*Id*. at p. 818.) Initially the trial court was cautious about admitting the hearsay statement of the victim, but then allowed the testimony after "it became apparent that the defense was attempting to portray [the victim] as a 'tough guy' with a bad temper who could become violent and unpredictable, especially while drinking." (*Id*. at p. 822.) This strategy "put in issue [the victim's] conduct, demeanor and actions." (*Ibid*.)

Such is not the case here. The theory of the defense case was Lopez did not have the mental state for murder: Malander's death was either accidental or "a rash or impulsive" act. Lopez did not argue self defense, nor did he argue that he was provoked. Lopez made no claim that Malander behaved in any manner inconsistent with her fear of him. Thus, her state of mind was not relevant to any issue. As a result, the trial court should not have admitted the various hearsay statements made by Malander in which she stated Lopez beat her and caused her injuries observed by others into evidence because the section 1250 exception did not apply.

The error, however, was harmless. (*Watson, supra*, 46 Cal.2d at p. 836; *People v. Wang, supra*, 46 Cal.App.5th at p. 1070 [applying *Watson* standard].) As detailed above, there was overwhelming evidence that Lopez committed numerous acts of domestic violence against Malander, including in the notes that he

21

wrote to Malander admitting that he hit her, the testimony of multiple witnesses who saw Lopez hit her, and observed injuries on her on numerous occasions.

Further, Lopez's explanation of Malander's death as the result of an accidental fall is belied by the record. She could not have died by falling onto a sharp object because the police found no such object at the scene of the crime capable of accidently inflicting the distinctive, long, narrow penetrating stab wound to her skull. Nor did Lopez show the police where Malander fell or otherwise identify any item that could have caused her fatal and distinct injury. Further, after viewing the photos of the crime scene, Dr. Dutra found no object capable of accidentally killing Malander. Perhaps most importantly, Lopez kept telling the dead Malander that he would not do it again.

In light of the foregoing, any error in admitting the hearsay statements attributed to Malander was not prejudicial.

## D. The Trial Court Did Not Abuse its Discretion by Declining to Instruct on the Lesser Included Offense of Involuntary Manslaughter

Lopez argues that the trial court erred by refusing his counsel's request to instruct the jury on the lesser included offense of involuntary manslaughter. We disagree. The trial court properly refused to give the instruction because it was not supported by substantial evidence.

### 1. *Applicable Law*

Murder is the unlawful killing of a human being with malice aforethought. (Pen. Code, § 187, subd. (a); *People v. Bryant* (2013) 56 Cal.4th 959, 964.) Malice may be express or implied. (Pen. Code, § 188, subd. (a).) It is express when the defendant intends to kill. (*Id.*, subd. (a)(1); *Bryant*, supra, at p. 964.) It is implied when the defendant (a) knowingly performs an act, the natural

consequences of which are dangerous to life; (b) with a conscious disregard for life.  (*People v. Brothers*, *supra*, 236 Cal.App.4th at p. 30.)

Involuntary manslaughter is a lesser included offense of murder.  (*People v. Thomas* (2012) 53 Cal.4th 771, 813.)  It is statutorily defined as a killing occurring during either: (1) the commission of an unlawful act not amounting to a felony, i.e., a misdemeanor; or (2) the commission of a lawful act which might produce death, performed in an unlawful manner or without due caution and circumspection.  (Pen. Code, § 192, subd. (b); *People v. Brothers*, *supra*, 236 Cal.App.4th at p. 31.)  The unlawful act must be "dangerous to human life or safety under the circumstances of its commission."  (*People v. Cox* (2000) 23 Cal.4th 665, 675.)  "A battery is any willful and unlawful use of force or violence upon the person of another."  (Pen. Code, § 242.)  A battery may constitute an unlawful act for purposes of involuntary manslaughter "if shown to be dangerous under the circumstances of [its] commission."  (*Cox*, *supra*, at p. 674.)

In addition to these statutorily defined means of committing the offense, an unintentional homicide, committed in the course of a noninherently dangerous felony, without due caution and circumspection, may be involuntary manslaughter.  (*People v. Burroughs* (1984) 35 Cal.3d 824, 835-836; *People v. Brothers*, *supra*, 236 Cal.App.4th at p. 31.)  And, a homicide committed in the course of an inherently dangerous assaultive felony and accomplished without malice (that is, without the intent to kill and without conscious disregard for life) is also involuntary manslaughter.  (*Brothers*, *supra*, at pp. 32, 33-34.)

23

2. *Trial Court's Duty to Instruct on Lesser Included Offenses*

" '[E]ven absent a request, and over any party's objection, a trial court must instruct a criminal jury on any lesser offense "necessarily included" in the charged offense, *if there is substantial evidence that only the lesser crime was committed.*' " (*People v. Smith* (2013) 57 Cal.4th 232, 239, italics added.)

Instruction upon a lesser included offense must be given only if the accused presents evidence sufficient "to deserve consideration by the jury, i.e., 'evidence from which a jury composed of reasonable men could have concluded' " that the particular facts underlying the instruction did exist. (*People v. Flannel* (1979) 25 Cal.3d 668, 684 & fn. 12.)

Due process requires that the jury be instructed on a lesser included offense if the evidence warrants such an instruction. (*Hopper v. Evans* (1982) 456 U.S. 605, 611 [102 S.Ct. 2049, 72 L.Ed.23 367]; *People v. Avena* (1996) 13 Cal.4th 394, 424.)

3. *Relevant Trial Court Proceedings*

During discussions regarding jury instructions, Lopez's counsel asked that the court give instructions on "any and all less[e]r-related offenses to the crime of murder." Counsel argued that the court should instruct on involuntary manslaughter because there was evidence from which the jury could conclude that Lopez committed an act that was reckless but without the intent to kill or conscious disregard for human life.

The trial court deferred ruling on the request. Subsequently, the court noted that it had met with both counsel in chambers. The court refused to give the involuntary manslaughter instruction, finding that it was not supported by substantial evidence. The court permitted the parties to state their positions for the record.

24

Lopez's counsel argued there was substantial evidence from which the jury could infer that "an act could have occurred causing the victim's death that would fall short of intent to kill or conscious disregard for human life."

The prosecutor argued that there was no evidence that Lopez committed any act that could support an involuntary manslaughter instruction, noting that Lopez's statements were that he was a bystander who saw Malander slip and fall.

The trial court ruled that it was "standing by its earlier decision" to not grant the defense request for the involuntary manslaughter instruction because it was not supported by substantial evidence.

4. *The Trial Court Properly Refused to Instruct on the Offense of Involuntary Manslaughter*

Lopez argues substantial evidence supported giving the instruction. Specifically, Lopez asserts that the "circumstances" of Malander's death (such as evidence from the crime scene showing signs of a struggle and Malander's recent bruises), together with the history of Lopez's domestic violence involving Malander, is substantial evidence from which the jury could have found that Malander's fatal injury occurred during a physical fight in which she fell or was pushed into something sharp. Without an instruction on involuntary manslaughter, Lopez concludes the jury was left with an "all or nothing choice" and likely convicted of second degree murder to avoid finding Lopez not guilty of any crime.

We disagree. There was no substantial evidence to support an instruction on involuntary manslaughter. Because the thin, straight, two-inch deep stab wound to Malander's temple is so distinctive, Dr. Dutra opined it was caused by a screwdriver. Dr. Dutra specifically ruled out that Malander could have suffered this

25

wound from falling onto the corner of a counter in the motorhome or onto an object or structure located outside the motorhome during their argument. It had to be an object "rigid enough that it penetrated through the skin and the skull," and the impact must have had "[a]bout as much force as it would take to slam closed a heavy door."

On cross-examination Lopez's counsel asked: "[I]s it possible that a person could fall and if there's a nail sticking out of a wall or the floor that the person may fall on a nail and a nail may penetrate the skull and the skin in the same fashion?" Dr. Dutra responded: "Yes, that would be possible, yes." However, no such "nail sticking out of [the] wall or the floor" was *ever found*. Nor was there any other evidence of accident. That leaves a single manner of death as the cause: a person pushing a long, hard, thin object into Malander's skull with the strength necessary to "slam" a "heavy door." As a result, the court did not err in refusing to instruct on involuntary manslaughter.

## DISPOSITION

The judgment is affirmed.
NOT TO BE PUBLISHED


SINANIAN, J.[*]

We concur:


ROTHSCHILD, P. J.          CHANEY, J.

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.